UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 23-367(2) (JMB/JFD)

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) **GOVERNMENT'S POSITION** |
| v. | ) **ON SENTENCING** |
| | ) |
| ROBIEL LEE WILLIAMS, | ) |
| | ) |
| Defendant. | ) |

Robiel "Moe Bills" Williams was part of a conspiracy that intended to traffic hundreds of thousands, if not more, of fentanyl pills from Arizona into Minnesota. He personally helped to assemble at least six packages containing approximately 280,000 pills that were shipped to the Twin Cities. Thankfully, police seized those packages–the largest seizure of fentanyl pills in Minnesota history[1]—and kept that poison from reaching Minnesota's homes, schools, businesses, and streets.

But other packages slipped through, and fentanyl kills. The Drug Enforcement Administration and health departments nationwide have repeatedly warned the public that "one pill can kill." Two milligrams of

---

[1] Paul Walsh, *Man Admits Role in Record Fentanyl Smuggling Scheme That Mailed Drug in Stuffed Animals to Twin Cities*, Minneapolis Star Tribune, June 20, 2024, https://www.startribune.com/2-admit-roles-in-record-fentanyl-smuggling-scheme-that-mailed-drug-in-stuffed-animals-to-twin-cities/600374836.

fentanyl is "considered a potentially lethal dose,"[2] meaning that one kilogram of fentanyl has the potential to kill 500,000 people. Naloxone—a drug used to counter the effects of an overdose—is approved for over-the-counter use.[3] Fentanyl is more than a crisis. It is a deadly epidemic.

Williams repeatedly flew to Arizona and was one of several co-defendants who concealed the pills in stuffed animals and prepared them to be mailed to the Twin Cities for further distribution. To avoid detection, Williams and other co-defendants lined the inside of the packages with dog treats to confuse drug-sniffing dogs and disguised the packages as birthday presents. If one pill can kill, then Williams and his co-defendants were endangering hundreds of thousands of lives.

The government recommends the Court sentence Williams to 151 months' imprisonment and five years' supervised release. That sentence is appropriate given the nature, circumstances, and seriousness of the offense; Williams's history and characteristics; and the need for the sentence to provide just punishment, promote respect for the law, deter Williams and others, and protect the public. It is sufficient, but not greater than necessary, to comply

---

[2] Drug Enforcement Administration, *Facts About Fentanyl*, https://www.dea.gov/resources/facts-about-fentanyl (last visited June 5, 2025).

[3] Food and Drug Administration, *FDA Approves First Over-the-Counter Naloxone Nasal Spray*, https://www.fda.gov/news-events/press-announcements/fda-approves-first-over-counter-naloxone-nasal-spray (last visited June 6, 2025).

with 18 U.S.C. § 3553(a) and ensure justice is served.

## FACTUAL AND PROCEDURAL BACKGROUND

A. Offense conduct

The Government concurs with the offense conduct as stated in the presence report (PSR). (ECF No. 443 at ¶¶ 6-17.) Williams was part of a drug trafficking organization (DTO) that shipped hundreds of thousands of fentanyl pills from Arizona to Minnesota. (ECF No. 443 at ¶¶ 8-9.) The bags of pills were concealed inside stuffed animals, which were themselves shipped via the U.S. Postal Service in packages disguised to look like birthday presents. (ECF No. 443 at ¶ 8.) The pills were destined for further distribution in Minnesota. (ECF No. 443 at ¶ 8.)

  

In January and February 2023, police seized six packages that the DTO shipped from Arizona to the Twin Cities. (ECF No. 443 at ¶ 9.) Those packages contained approximately 280,000 fentanyl pills, weighing almost 31 kilograms. (ECF No. 443 at ¶ 9.) Unfortunately, some packages slipped through, as "members of the conspiracy successfully shipped other packages of fentanyl

3

pills from Phoenix to the Twin Cities, and those pills were distributed to others." (ECF No. 443 at ¶ 9.) By one estimate, between the beginning of 2021 through approximately February 2023, for almost two years, co-defendant and DTO leader Cornell Montez Chandler, Jr. actively mailed packages of fentanyl to the Twin Cities every one to two months. (ECF No. 443 at ¶ 12.)

At least two co-defendants received such packages, (ECF No. 443 at ¶ 9, 15.) Another co-defendant used his apartment as a distribution location. When police executed a search warrant there, they discovered several large stuffed animals with their backs cut open, (ECF No. 443 at ¶ 10), indicating the bags of pills were being removed from the animals at the apartment and distributed further.



Although not the DTO's leader, Williams played a significant part in the conspiracy, as he is one of several defendants who traveled to Phoenix and helped package the pills for mailing to Minnesota. (ECF No. 443 at ¶ 9.) His

4

latent prints were recovered from all six seized parcels.  (ECF No. 346 at ¶ 2.)

B.  Criminal history

Williams comes to this Court with two adult convictions.  In July 2021, he pled guilty to misdemeanor domestic assault.  (ECF No. 443 at ¶ 39.)  In that case, Williams slapped his girlfriend and threw her to the ground on a light rail platform in St. Paul.  (ECF No. 443 at ¶ 39.)  A few weeks after pleading guilty in that case, Williams pled guilty to fleeing a peace officer in a motor vehicle.  (ECF No. 443 at ¶ 40.)  Williams received eight days in jail and one year of probation for the domestic assault and two years' probation for the fleeing offense.  He was discharged early from the two-year probation term, just two days after being discharged from the one-year probation term.  (ECF No. 443 at ¶¶ 39-40.)

In addition to those convictions, Williams has been in other trouble with the law.  In 2020, he was charged with felony third-degree burglary.  (ECF No. 443 at ¶ 43.)  That case was not dismissed due to issues with evidence or guilt, but rather "in the interests of justice after Williams successfully completed a community-based restorative justice process."  (ECF No. 443 at ¶ 43.)  In August 2023, Williams was charged with possessing a pistol without a permit.[4]  (ECF No. 443 at ¶ 43.)  Again, his case was dismissed not due to evidentiary

---

[4] Because of his misdemeanor conviction for domestic assault, Williams was not permitted to possess a firearm.  18 U.S.C. § 922(g)(9).

5

or proof concerns, but rather because he pled guilty in the present case. (ECF No. 443 at ¶ 43.) Convictions on both those offenses would have given Williams four criminal history points, placing him in category III instead of II.

### C.  Procedural history

On December 12, 2023, a grand jury returned an indictment charging Williams with one count of conspiring to distribute fentanyl in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 846. (ECF No. 1.) The defendant pled guilty on January 16, 2025. (ECF No. 345.)

In the plea agreement, the parties agreed the base offense level was 36, that the defendant was eligible for a three-level reduction for accepting responsibility, and that the defendant had a criminal history category of II. (ECF No. 346 at ¶ 7a, 7e, and 7f.) The plea agreement also contemplated a possible two-level reduction if Williams satisfied all requirements for the safety valve, (ECF No. 346 at ¶ 7b and 7g), but Williams has not completed the required proffer. (ECF No. 443 at ¶ 23.) The parties agreed that if the safety valve did not apply, the advisory guidelines range for imprisonment would 151-188 months' imprisonment. (ECF No. 346 at ¶ 7f.)

### D.  The government's position on the PSR

The PSR's calculations regarding base offense level, total offense level, criminal history category, and guidelines range matched those contemplated in the plea agreement. (ECF No. 346 at ¶¶ 22-31, 41, 80).

## THE APPROPRIATE SENTENCE

The Court should sentence Williams to 151 months' imprisonment and 5 years' supervised release. That sentence credits Williams's acceptance of responsibility while also accounting for the danger his actions posed to the public, his escalating criminal conduct, and the seriousness of the offense.

A. Legal standard

*Gall v. United States* sets forth the appropriate sentencing methodology: a district court calculates the advisory Guidelines range and, after hearing from the parties, considers the 18 U.S.C. § 3553(a) factors to determine an appropriate sentence. 552 U.S. 38, 49-50 (2007); *United States v. Ruvalcava-Perez*, 561 F.3d 883, 886 (8th Cir. 2009).

"[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *Gall*, 552 U.S. at 49. "[U]nder the advisory guidelines scheme, sentencing judges are required to find sentence-enhancing facts only by a preponderance of the evidence." *United States v. Scott*, 448 F.3d 1040, 1043 (8th Cir. 2006). In addition, a district court must assess the other applicable sentencing factors under Section 3553(a). Those factors include the nature and circumstances of the offense; the history and characteristics of the defendant; the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, to afford adequate deterrence to criminal

7

conduct, and to protect the public from further crimes of the defendant; the need to avoid unwarranted sentencing disparities; and the need to provide restitution to victims. 18 U.S.C. § 3553(a).

B. Evaluation of § 3553(a) factors

The most relevant factors are the nature, circumstances, and seriousness of the offense; Williams's history and characteristics; and the need for the sentence to provide just punishment, deter Williams and others from committing future crimes, and promote respect for the law.

**1. The nature, circumstances, and seriousness of the offense justify a sentence to 151 months' imprisonment**

The nature and circumstances of the offense warrant a sentence to 151 months' imprisonment. Any case of drug trafficking is serious. This case goes beyond that. Fentanyl has, and continues to, ravage the community and destroy lives. Williams played a direct role in shipping hundreds of thousands of pills to the Twin Cities for further distribution. Although police seized almost 31 kilograms of pills, many more packages slipped through and the pills inside distributed to others. If one pill can kill, Williams and his co-defendants endangered tens of thousands, if not more, lives. Standing alone, the quantity of fentanyl involved and the danger it posed warrants a significant sentence.

A sentence to 151 months' imprisonment is no small matter. True, Williams was not a leader, manager, or organizer like co-defendant Chandler.

8

He did not possess a firearm, unlike co-defendants Bankhead and White. But he was also not a minor participant. He did not simply receive a package and take it a few miles to Bankhead's apartment. Instead, like Chandler, Williams flew to Phoenix at least twice and helped to assemble all of the seized parcels, as his latent prints were on the packages shipped and seized in January and February 2023.

**2. Williams's history and characteristics warrant a sentence to 151 months' imprisonment**

Williams's history and characteristics also support a sentence to 151 months' imprisonment. Although he is far from the worst offender this Court has seen, his record shows that despite multiple "second" chances, he refuses to obey the law. As an adult, he avoided a felony burglary conviction when he completed a restorative justice process in October 2020. (ECF No. 443 at ¶ 43.) Shortly before the burglary case was dismissed, he battered his girlfriend on a light rail platform, and in May 2021, he fled police by speeding away when they tried to pull him over.[5] (ECF No. 443 at ¶¶ 39-40.) He successfully completed probation for those offenses in September 2022. (ECF No. 443 at ¶¶ 39-40.)

Mere months later, Williams was in Phoenix, packaging hundreds of thousands of fentanyl pills for shipment to Minnesota.

---

[5] The PSR briefly discusses these crimes, but the government described them in more detail in its motion for detention and the accompanying exhibits. (ECF No. 43.)

9

In other words, Williams got his first second chance when he was offered restorative justice instead of a guilty plea to a felony. What did he do with that second chance? He battered his girlfriend, fled from the police, possessed a loaded pistol in his waistband, (ECF No. 443 at ¶ 46; ECF No. 43 at 9-10; ECF No. 43-10), and participated in this fentanyl trafficking conspiracy. This shows that lesser sanctions did nothing to deter or rehabilitate Williams. If anything, restorative justice, probation, and a mere eight days in jail showed Williams that he could break the law and not suffer significant consequences. It is time to correct Williams's misunderstanding.

True, Williams had a horrific childhood. The presentence report discusses in detail the hardships and trauma he has endured. Out of respect for Williams's privacy, the government will not discuss those here. The Court can and should consider the mitigating impact of those hardships and trauma. That mitigation, though, goes only so far. This case was not a mere crime of opportunity or necessity. It was deliberate.[6] Williams had to go to the airport, fly to Phoenix, get to the stash house, assemble the packages for shipment, and

---

[6] The PSR states that during Williams's interview with the U.S. Probation Office, Williams "said he was 'high' throughout [the relevant] period and regrets the decisions he made while under the influence of controlled substances." (ECF No. 443 at ¶ 20.) That is a copout on Williams's part. While the Government does not doubt that Williams was addicted to opioids at the time, this was not a spur-of-the-moment or impulsive crime. It was deliberate and calculated, and Williams had to have had at least a few moments of clarity during participation in the conspiracy, all of which undercuts his "I was high" excuse.

return to Minnesota. At multiple points, Williams had the chance to consider what he was doing and stop. He didn't. And because he didn't, he bears responsibility for sending hundreds of thousands (if not more) fentanyl pills for distribution into Minnesota's homes and streets.

Williams's failure to complete a safety valve proffer also bears consideration. To be clear, nothing requires Williams to complete such a proffer. However, he has everything to gain and nothing to lose from doing so. This case was indicted a year and a half ago. Every defendant has pled guilty. The investigation is finished. Williams's proffer would be historical in nature—all he would need to do is "truthfully provide[] to the Government all information and evidence [he] has concerning the offense." 18 U.S.C. § 3553(f)(5). He very likely would not be telling the Government anything it did not already know.

Despite that, Williams has declined to complete a safety valve proffer. Although he accepted responsibility by pleading guilty, his refusal to proffer raises the question of how sorry he truly is for his crime and how ready he is to rehabilitate.

**3. The need for the sentence to provide just punishment, deter Williams and others from committing future crimes, promote respect for the law, and protect the public justify a sentence to 151 months' imprisonment**

Finally, a sentence to 151 months' imprisonment will justly punish

Williams for his crime, deter others and (hopefully) him from committing future crimes, and promote respect for the law. Congress has mandated tough sentences in recognition of the danger that drugs pose to the public, and fentanyl, as discussed above, poses a unique danger. Thankfully, police seized hundreds of thousands of pills, likely saving lives in the process. But more packages slipped through, endangering an untold number of people. The scope and brazenness of the conspiracy and Williams's role in it warrants a significant punishment above the mandatory minimum. A sentence to 151 months—above the mandatory minimum but also at the bottom of the Guidelines range—is significant and just.

Such a sentence will also promote respect for the law, as it shows Williams and the public that there are consequences for committing crimes. It will also, hopefully, deter Williams from breaking the law in the future. He will still be in his thirties when he completes his sentence with decades of life ahead of him. After spending 151 months in prison, Williams should be convinced not to commit more crimes, lest he return to prison. But if that sentence doesn't deter Williams, it will at least incapacitate him and protect the public for the duration of his sentence.

## CONCLUSION

For these reasons, the Government asks the Court to sentence Williams to 151 months' imprisonment and five years' supervised release.

Dated: June 7, 2025

Respectfully Submitted,

JOSEPH H. THOMPSON
Acting United States Attorney

*s/ Campbell Warner*
Campbell Warner
Assistant U.S. Attorney